HEARD APRIL TERM, 1872.

## CURETON vs. WATSON.

In October, 1861, a debt due to the ward, well secured 'by a bond with sureties, and a mortgage of real estate given in 1858, was discharged by the guardian, and a note of the principal debtor, with one surety, taken in payment. In April, 1863, the guardian received payment of the note in Confederate currency, then much depreciated, and invested the amount in Confederate States eight per cent. bonds : *Held*, That the guardian was liable for the amount of the debt.

The guardian held liable for other sums invested in 1863 in Confederate States eight per cent. bonds.

In the years 1862, 1863 and 1864, the guardian received Confederate currency for the hire of his ward's negroes hired during the war: *Held*, That for these sums the guardian was not chargeable, if, upon enquiry, it should appear that they were invested for the ward in Confederate States 8 per cent bonds.

### BEFORE THOMAS, J., AT YORK, NOVEMBER TERM, 1871.

Bill in Equity by Benjamin J. Cureton, and Alice M., his wife, plaintiffs, against Joseph J. Watson, defendant, for account.

The facts of the case are stated in the report of the Referee given below in full, and it is only necessary to state here : that the defendant was appointed by the Court guardian of the female plaintiff in March, 1860 ; that the bond and mortgage of Massey to the Commissioner in Equity, mentioned in the report, were given in December, 1858 ; that the sums received for negro hire were for the hire of the ward's negroes in the years 1861–'62 and '63; and that Watson died after the evidence had been taken by the Referee, and the bill was revived against F. H. Barber, his administrator.

John G. Enloe was appointed Referee in the cause, and it was referred to him to take and state the accounts of the defendant. He made the following report:

"It having been referred to me as Special Referee, by order of the Court, to inquire and report as to the amount received by the defendant as guardian of Alice M. Stewart, now Alice M. Cureton, wife of B. J. Cureton, and the balance now due to the complainant on account of said guardianship, with leave to report any special matter, in compliance with said order, I respectfully report as follows :

"The paper annexed, marked A, contains a statement of the accounts of the defendant as guardian, making the balance due on the 18th September, 1871, $3,708.91. In said statement, I have allowed defendant credit for the notes of J. R. Daniel and C. J Kee, given for negro hire, it being in proof that said persons and

sureties were solvent when the notes were taken and subsequently became insolvent.   Also, the note of B. J. Patterson, for same reasons.

"I have also allowed the defendant credit for the amount of $550, loaned by him to D. C. Roddey & Brother, with interest thereon from 18th March, 1860, as it is in proof that said parties were entirely solvent at the time of said loan, and subsequently became insolvent.

"The real estate of James Stewart, deceased, under a decree made by Chancellor Job Johnston, on the 16th day of November, 1858, was sold by the Commissioner in Equity, and the purchase money secured by bond of the purchaser, with good and sufficient sureties, and a mortgage of the premises.   Among the purchasers was B. H. Massey.   The interest of Alice M. Stewart in his bond, secured as aforesaid under the decree of the Court, was $1,767.73, on the 14th of October, 1861.   On said date, with the consent of said defendant, J. J. Watson, the said bond was marked satisfied, and on the same day the defendant took the note of the said B. H. Massey for the said sum of $1,767.73, with J. H. Stewart as surety.

"In March, 1863, the defendant said to B. H. Massey and others: 'If any of you gentlemen that owe me wish to pay me, you must do it by a certain day specified, as I then expect to go to York to fund it in Confederate bonds.'   B. H. Massey replied that he was owing him and would pay him before that day, which he did, and on the 17th of April, 1863, defendant invested the amount in Confederate bonds.   Whether, as guardian, the defendant had the right to act as above stated, involves legal questions which I respectfully submit for the decision of the Court.

"The defendant, also, on different occasions, specified in the testimony, collected notes and other claims due his ward's estate, receiving Confederate money in payment of the same, and invested the same in Confederate bonds.   Whether he should be allowed credit for said investments, also involves legal points which I respectfully leave for the decision of the Court."

The defendant excepted to the report, because the Referee should have allowed him credit for the whole amount invested by him for his ward in Confederate States bonds.

The Referee overruled the exception, and the case came before the Circuit Judge on the exception to the report.

His Honor sustained the exception, and made a decree that the bill be dismissed.

The plaintiffs appealed on grounds which will be fully understood from the opinion of this Court.

*Wilson*, for appellant:

The money due on Massey's bond was not needed for the purposes of the guardianship, and the mortgage securing the bond could not have been discharged otherwise than by payment or tender in coin or United States currency. Accepting Massey's note, and afterwards payment of same in Confederate currency, was an unnecessary act, imprudent, careless, and without any prospect of benefit to ward's estate.—*Fitzsimmons* vs. *Fitzsimmons*, 1 S. C., 413; *Mayer* vs. *Mordecai*, 1 S. C., 383; *Sanders* vs. *Rogers*, 1 S. C., 458–9; *Allen* vs. *Gaillard*, 1 S. C., 279. "It is not the duty of trustees to call in money invested on good real security where no risk is apparent." Hill on Trustees, 562, 381; *Howe* vs. *Earl of Dartmouth*, 7 Ves., 150; *Sadler* vs. *Turner*, 8 Ves., 621. "Even an express power for the trustees to vary the securities, does not authorize changes made without any apparent object, or any prospect of benefitting the trust estate.—Hill on Trustees, 563; *Brice* vs. *Stokes*, 11 Ves., 324.

Facts similar to the case of *Mayer* vs. *Mordecai*. The Court say: "What has been said in regard to the bond of White, applies with still more force to those of Kerr & Goldsmith. The trustee, under the circumstances already referred to, *invited* or *called* them in, without any offer of payment from the obligers," p. 397. "If the act in itself was an incautious one, it will not be sustained, and no aid, derived from the fact that the trustee was countenanced in it by the participation of prudent men, will give it sanction or support," p. 398.

The Act of the Legislature, 25th December, 1861, only applied to guardians and other trustees having *funds to invest*.

*Hart*, contra:

1. The first ground in appellants' brief takes exception to the fact that the guardian, Watson, drew from Commissioner's office a certain fund, ($1,767.73,) and loaned it out on personal security. "It is the ordinary duty of trustee to collect with all convenient speed."—Hill on Trustees, 380.

The Act of the Legislature of 1748, 3 Stat., 708, *requires* guardians to possess themselves of wards' estate. Trustees' liability not measured by an abstract rule of duty. "Is there, or is there

not, evidence of faithful endeavors to perform it."—*Hext* vs. *Porcher*, 1 Strob. Eq., 170. No rule in this State prescribing securities in which trustees shall invest.—*Boggs* vs. *Adger*, 4 Rich., 408.

2. But the ward's interest was not lost by this act of the trustee. He may have assumed great risk, but nothing more than a risk in lending on personal security. Had it been lost here, the act might not have been sustained.—2 Story's Eq. Jur., 641.

The Courts in England have sustained such investments upon general principles, even where the fund was lost in consequence.— *Harden* vs. *Parsons*, 1 Eden., 148.

Chancellor Kent sustains the same view in the cases cited.— *Smith* vs. *Smith*, 4 Johns. Ch., 281, 441.

Not a dollar seems to have been lost, but the note was collected in full in 1863, which brings us to the Confederate bonds:

1. The investment was authorized by State law.—A. A., 1861, 13 Stat., 87.

2. Authorized by Act of Confederate States Congress.

3. A ruinous tax imposed, if not invested; and also tax upon outstanding obligations for money when payment in Confederate notes refused.

4. The best advice sought and active diligence displayed. Court of Ordinary of the County advised it generally.

5. The investment had the implied sanction of plaintiff, who made no objection in 1864.

If he made a mistake, he is not liable where the alternative of investing in different securities is given.—*Shepherd* vs. *Mouls*, 4 Hare, 500; Hill on Trustees, 371, note; *Robinson* vs. *Robinson*, Hill, 374, note.

Where a trustee, in investing funds, acts *faithfully* and with "common diligence" and sagacity, he will not be liable if the funds be lost.—*Boggs* vs. *Adger*, 4 Rich., 408.

"Transactions in Confederate currency during the war and investments in Confederate securities (when properly made) must now be held to be as valid and binding as if made in times of peace in a sound currency."

"Definitely settled by legislative enactments, by repeated decisions of the Court, recognizing the validity of such decrees and investments, and by the Supreme Court of the United States.— *Walker*, *Ex'r.*, vs. *Page*, 21 Grattan's Va. Reps.

"A contract having been entered into between parties, valid at the time by the laws of the State, no decision of the Courts of the

State subsequently made can impair its obligation."—*Chicago* vs. *Sheldon*, 9 Wal., 50.

A guardian who invested the funds of his ward *bona fide* in Confederate bonds, under a statute passed during the rebellion, authorizing such investments, is entitled to credit for the amount invested. —*Owen* vs. *Peebles*, 42 Ala., 338.

Trustee accepted payment in 1863 of a judgment on promissory note, in Confederate notes, without objection. There was no evidence of bad faith : *Held,* That judgment debtor was not liable, and whether trustee had acted in good faith was a question for the jury.—*King* vs. *King,* 37 Ga., 205.

The case of *Mayer* vs. *Mordecai* differs from this :

1. That the *cestui que trust* was to be consulted as to the investment of the funds.

2. They (the bonds) secured by mortgage were collected in 1863 for less than they would have sold for.

3. There was evidence that they would have sold for more than their face value.

II. In *Fitzsimmons* vs. *Fitzsimmons,* (1 S. C., 413,) the Court says : " The principal question is, whether the unreasonable detention by the administratrix of the effects of the estate subject her to liability for that portion lost by inevitable, accident." That question was decided against her; and the whole evidence in the case showed *laches* and bad faith in dealing with the trust estate. She was not a guardian, but an administratrix.

III. In *Sanders* vs. *Rogers,* (1 S. C., 458,) the trust deed required an investment of the funds by the trustee " as soon as practicable," in a particular species of property, a requirement which he apparently made no effort to comply with. There was no discretion to exercise in the execution of the trust, and when he violated it he at once became liable.

IV. In *Allen* vs. *Gaillard,* (1 S. C., 279,) the trustee invested in a second class personal security, having only a speculative value. There was not shown any *mala fides,* but the Court supposed the investment, under the circumstances, an imprudent one.

In *Sanders* vs. *Rogers,* decided later, the Court lays down a more liberal rule than the one governing in *Allen* vs. *Gaillard.* It is virtually overruled.

In *Clark* vs. *Tompkins,* (1 S. C., 128,) the Court says: " Had he (guardian) in good faith, with funds in hand, made an investment for his wards, which was lost from circumstances beyond his control,

he might have submitted a claim to the Court for an extension in his behalf of the principles which govern it in passing upon the conduct of those who occupy fiduciary relations."—*Nance* vs. *Nance*, 1 S. C., 209.

Aug. 12, 1872. The opinion of the Court was delivered by

MOSES, C. J. The decree of the Circuit Court sustains the investment made by the defendant, as guardian of the plaintiff, Alice M., and dismisses the bill.

There is a question, however, which lies behind that, and which the Judge below has entirely failed to consider. It is a material point made in the case, and one on which the plaintiffs' strongly relied for the relief asked by their proceeding. It refers to the duty of the guardian in calling in the outstanding securities, and thus, himself, providing a fund in hand for investment. It was one of the points submitted for the judgment of the Court by the report of the special Referee.

The principal item is the sum of $1,767.73, averred to have been received of B. H. Massey on 11th April, 1863. The transaction in regard to this debt was as follows: The plaintiff, Alice M., was entitled to a bond of the said B. H. Massey, with good and sufficient sureties, and also secured by a mortgage of real estate, given on the sale of the property of her deceased father, sold by the Commissioner in Equity, under an order of the Court, and by him held. On the 14th of October, 1861, without any money having been paid to the Commissioner or Watson, the latter receipted for the full amount to the former, and the bond was marked satisfied. On the same day Watson took the note of Massey for the said sum, with J. H. Stewart as surety. What was the motive which induced the change, it is difficult to imagine, so far as Watson could have had in view the interest he was bound to protect. It was said in *Sanders* vs. *Rodgers*, 1 S. C. 459, on the authority of Lord Eldon, "that generally it is not the duty of trustees to call in money, invested in good real estate, where there is no probable risk." Here it seems to have been called in without any necessity for its immediate use, and without the purpose of obtaining a higher rate of interest, and for no conceivable object, having in view any advantage to the ward. Where a concession of this extraordinary kind is made, he who makes it, assumes all the hazard of loss, and must bear the consequences.

Let us now pursue the note. On 11th April, 1863, payment of

it was accepted in Confederate money, and about the 17th of the same month, the proceeds were funded in 8 per cent. Confederate bonds. At this time there had been a great depreciation in the currency of the country, and the result of this operation between Massey and Watson was, that the former actually paid for the land an amount in a depreciated currency, nominally equal to the sum due on the bond, but which was demandable and payable in specie. The difference is not perceived between this case and that of *Sanders* vs. *Rogers*, so far as relates to the acceptance of Confederate notes by Pawley, in satisfaction of the bonds payable in gold, and secured by a mortgage of real estate, or that of *Meyer* vs. *Mordecai*, (1 S. C., 383,) so far as relates to the general principle applicable to the collection of the bonds by the defendant there. Watson, in effect, exchanged a bond secured by personal sureties and a mortgage of landed property, for a simple note of hand, with one surety. Are we to require testimony to satisfy us of the relative marketable value of each of the paid securities, considered even without reference to their respective dates? When, however, it is remembered that the bond was given in 1858, promising the payment, in gold and silver, and the note in 1861, leaving doubtful the character of the currency to be required for its payment, a difference in their value at once appears to the prejudice of the latter, though the full extent is not shown in the testimony.

In *Nance* vs. *Nance*, (1 S. C., 209,) it was held that the duty of the guardian, or other trustee, required him to take as security mortgage of unencumbered real estate of value sufficient to make the fund safe; and it is only where such real security can not with reasonable diligence be procured, that he may take personal security in lieu thereof. The defendant here, so far from presenting a case coming within the rule there laid down, actually exchanged the security of the higher grade for that of the lower. The course of the guardian in this particular is in evident conflict with the duty imposed by his trust, and cannot be upheld.

Then, as to the other items of investment, in his return of 1860 he includes $650, received on 10th April, $184.87, on 17th July, and, in his testimony, states that these sums, with $250 transferred on 24th March, 1861, from himself, as administrator of M. M. Stewart, to himself as guardian of Alice Stewart, and various other sums received down to 1863, were all included in the said bonds for $3,000, for which he claims credit. It is a little singular that, so far as appears by his returns filed, none of the credits disclosed by

him are included in them after the entry of July 17, 1861, except the amount received from Massey. It is not less strange that, of those received in 1860.and 1861, to say nothing of 1862, he never thought it necessary to put them in the shape of an investment un- til about 17th April, 1863. There is something more, in the evi- dence of the defendant, which cannot escape attention or remark.

He refers to various receipts as comprised in " the bonds above alluded to," or " embraced in said bonds," or in bonds above reci- ted. The bonds call for $3,000, and the various sums said to be so funded are in excess of that amount. It is not contended that such bonds were at a premium, and the diminution thus accounted for.

The report states that " the defendant, also, on different occa- sions, specified in the testimony, collected notes and other claims due his ward's estate, receiving Confederate money in payment of the same, and invested the same in Confederate bonds." We are to as- sume that these notes and claims were based on a specie currency. The testimony is conclusive to show that, without any offer of pay- ment by the debtors, he notified them " .that he would (on a certain day) invest in Confederate bonds, and that those who owed, and wished to pay, must do it by that time."

In conformity with this intimation, he received the Confederate money, which was at a large discount, compared with gold, which he had a right to demand—waived such right, and accepted what he knew was a depreciated medium. The loss which resulted should not be endured by the ward, who was without power to avert it.

It would have placed the defendant in a better position, if at the time of the alleged investment, he had so endorsed the bonds that the ownership in them might have plainly appeared, or to have en- tered in his return of 1863, a credit in his favor by the amount in- vested, thus shewing the disposition of the balance with which he stood charged. If, in the course of events, the result of which could not be foretold, the bonds had attained a par value in gold, while the Confederate Treasury notes may have been below it, there was nothing on which she could have relied to claim property in them. He himself says in his examination, " the moneys he collected for his ward, he did not keep separate, but mingled it with his own."

The defendant, however, is entitled to a credit for the negro hire received in 1862, 1863 and 1864, if charged with it in the account, and if included in the bonds or certificates to which he refers in his testimony. This hire accrued yearly, had reference to the prevail- ing circulation, and was receivable in it. He should also be credited

with any payment of taxes he made, and of which in the account he has not had the benefit.

It is ordered and adjudged that the order of the Circuit Judge, dismissing the bill, be set aside. That the case be remanded to the Circuit Court for York County, that the necessary orders may be had, to give full effect to the principles and directions herein expressed.

*Willard*, A. J., and *Wright*, A. J., concurred.