# APPLICABILITY OF THE EMOLUMENTS CLAUSE AND THE FOREIGN GIFTS AND DECORATIONS ACT TO THE PRESIDENT'S RECEIPT OF THE NOBEL PEACE PRIZE

*The Emoluments Clause of the Constitution does not apply to the President's receipt of the Nobel Peace Prize.*

*The Foreign Gifts and Decorations Act does not bar the President from accepting the Peace Prize without congressional consent.*

December 7, 2009

## MEMORANDUM OPINION FOR
## THE COUNSEL TO THE PRESIDENT

This memorandum concerns whether the President's receipt of the Nobel Peace Prize would conflict with the Emoluments Clause of the Constitution, which provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. As we previously explained in our oral advice and now explain in greater detail, because the Nobel Committee that awards the Peace Prize is not a "King, Prince, or foreign State," the Emoluments Clause does not apply. You have also asked whether the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (2006), bars the President from receiving the Peace Prize. Here, too, we confirm our previous oral advice that it does not.

## I.

On October 9, 2009, the Norwegian Nobel Committee (the "Peace Prize Committee" or the "Committee"), headquartered in Oslo, Norway, announced that the President will be this year's recipient of the Nobel Peace Prize. The 2009 Peace Prize, which will consist of ten million Swedish Kroner (or approximately $1.4 million), a certificate, and a gold medal bearing the image of Alfred Nobel, is expected to be awarded by the Nobel Committee to the President on December 10, 2009—the anniversary of Nobel's death. *See Statutes of the Nobel Foundation* § 9, *available at* http://nobelprize.org/nobelfoundation/statutes.html (last visited Nov. 24, 2009) ("Nobel Foundation Statutes"); *see also The Nobel Prize Amounts, available at* http://nobelprize.org/nobel_prizes/amounts.html (last visited Nov. 24, 2009).

The Peace Prize is a legacy of Swedish chemist Alfred Bernhard Nobel. In his will, Nobel directed that a portion of his wealth be used to establish a set of awards, one of which, the Peace Prize, was intended to honor the person or entity that "shall have done the most or the best work for fraternity between nations, for the abolition or reduction of standing armies and for the holding and promotion of peace congresses." Nobel Foundation Statutes § 1 (setting forth the pertinent provision of Nobel's will). The relevant assets of the Nobel estate have been managed since 1900 by the Nobel Foundation, a private institution based in Stockholm, Sweden. *See* Birgitta Lemmel, *The Nobel Foundation: A Century of Growth and Change* (2007), *available at* http://nobelprize.org/nobelfoundation/history/lemmel (last visited Nov. 24, 2009). The

Foundation is responsible for managing the assets of the bequest in such a manner as to provide for the annual award of the Nobel prizes and the operation of the prize-awarding bodies, including the Nobel Committee that selects the Peace Prize. Nobel Foundation Statutes § 14; *see also* Lemmel, *supra* ("One vital task of the Foundation is to manage its assets in such a way as to safeguard the financial base of the prizes themselves and of the prize selection process."). Unlike the other Nobel prizes, for accomplishments in fields such as literature and physics, which are awarded by committees appointed by Swedish institutions, Nobel specified in his will that the recipient of the prize "for champions of peace" was to be selected "by a committee of five persons to be elected by the Norwegian Storting [i.e., the Norwegian Parliament]." Nobel Foundation Statutes § 1.

On April 26, 1897, the Storting formally agreed to carry out Nobel's will and, in August of that year, elected the first members of the Nobel Committee that would award the prize funded by Nobel's estate. That Committee—not the Storting itself, or any other official institution of the Norwegian government, or the Nobel Foundation—has selected the Peace Prize recipients since 1901. To be sure, in its nascent years, the Nobel Committee was more "closely linked not only to the Norwegian political establishment in general, but also to the Government," than it is today. *See* Øyvind Tønnesson, *The Norwegian Nobel Committee* (1999), *available at* http://nobelprize.org/nobel_prizes/peace/articles/committee (last visited Nov. 24, 2009). Indeed, until 1977, the Committee's official title was the Nobel Committee of the Norwegian Storting. Nevertheless, it has long been recognized that the "[C]ommittee is formally independent even of the Storting, and since 1901 it has repeatedly emphasized its independence." Tønnesson, *supra*. In 1936, for instance, the Norwegian Foreign Minister and a former Prime Minister recused themselves from the Committee's deliberations out of concern that bestowing the award on the German pacifist Carl von Ossietzky would be perceived as an act of Norwegian foreign policy. *Id.*; *see also Berlin Protests Ossietzky Award*, N.Y. Times, Nov. 26, 1936, at 22 (noting that "Norway [d]enies [r]esponsibility for Nobel [d]ecision"). To make clear the independent nature of the Committee's decisions, moreover, the Storting in the very next year, 1937, barred government ministers from sitting on the Nobel Committee. *See Special Regulations for the Award of the Nobel Peace Prize and the Norwegian Nobel Institute, etc., adopted by the Nobel Committee of the Norwegian Storting on the 10th day of April in the year 1905 (including amendments of 1977, 1991, 1994, 1998 and 2000)* § 9, *available at* http://nobelprize.org/nobelfoundation/ statutes-no.html (last visited Nov. 24, 2009) ("Nobel Peace Prize Regulations") ("If a member of the [Nobel] Committee is appointed a member of the Government during his period of office, or if a member of the Government is elected a member of the Committee, he shall resign from the Committee for as long as he continues in office as a Minister"). Furthermore, for more than 30 years, no member of the Committee has been permitted as a general matter to continue serving in the Storting. *See* Tønnesson*, supra* ("[I]n 1977 . . . the Storting decided that its members should not participate in nonparliamentary committees appointed by the Storting itself.").[1] That said, an appointment to the Committee does not appear to require a sitting member of the Storting to resign immediately from his or her government position, and thus two of the current members, who joined the Nobel Committee in 2009, appear to have served on the Storting during much, if not all, of the period during which this year's

---

[1] To further emphasize the Committee's independence from the Norwegian government, including the monarchy, "[u]nlike the prize award ceremony in Stockholm [for the other Nobel Prizes], it is the Chairperson of the Nobel Committee, and not the King [of Norway]" who formally presents the Peace Prize. Tønnesson, *supra*.

Prize recipient was selected. *See* List of Nobel Committee Members, *available at* http://nobelpeaceprize.org/en_GB/nomination_committee/members/ (last visited Dec. 4, 2009). The other three members of the Committee were private individuals. *Id.*

Apart from the Storting's role in selecting the members of the Nobel Committee, the Norwegian government has no meaningful role in selecting the Prize recipients or financing the Prize itself. In addition to fully funding the Prize, the Sweden-based private Nobel Foundation, established pursuant to Alfred Nobel's will, is responsible for the Committee's viability and the administration of the award. Specifically, your Office has informed us that the Committee's operations, including the salaries of the various Committee members and of the staff, are funded by the Foundation and not by the Norwegian or Swedish governments. *See* E-mail from Virginia R. Canter, Associate Counsel to the President, to David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel (Nov. 2, 2009, 19:11 EST) ("E-mail to Barron") (summarizing telephonic interview with Geir Lundestad, Secretary to the Nobel Committee and Director of the Nobel Institute); *see also* Nobel Foundation Statutes § 11 ("The Board of the Foundation shall establish financial limits on the work that the prize-awarding bodies perform in accordance with these statutes"); *id.* § 6 ("A member of a Nobel Committee shall receive remuneration for his work, in an amount to be determined by the prize-awarding body [i.e., the Nobel Committee].")). The Committee also deliberates and maintains staff in the Nobel Institute building, which is owned by the private Nobel Foundation rather than by the government of Sweden or Norway. *See The Nobel Institute*, *available at* http://nobelpeaceprize.org/en_GB/institute/ (last visited Dec. 4, 2009) (noting that Nobel Institute building is also where the recipient of the Peace Prize is announced); *see also* Description of Nobel Institute Building, *available at* http://nobelpeaceprize.org/en_GB/institute/nobel-building/ (last visited Dec. 4, 2009). Although the Nobel Foundation plays a critical role in sustaining the Nobel Committee and the Peace Prize, it is the Nobel Committee that independently selects the Prize recipients. *See* Organizational Structure of the Nobel Entities, *available at* http://nobelprize.org/ nobelfoundation/org_structure.html (last visited Nov. 24, 2009) ("The Nobel Foundation does not have the right or mandate to influence the nomination and selection procedures of the Nobel Laureates."); *see also* Lemmel, *supra* ("[T]he Prize-Awarding Institutions are not only entirely independent of all government agencies and organizations, but also of the Nobel Foundation.").

## II.

The Emoluments Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. Adopted unanimously at the Constitutional Convention, the Emoluments Clause was intended to recognize the "necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence," specifically, undue influence and corruption by foreign governments. *See* 2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., rev. ed. 1966) (notes of James Madison); *see also* 3 *id.* at 327 ("It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states." (remarks of Governor Randolph)); *Applicability of the Emoluments Clause to Non-Government Members of ACUS*,

3

17 Op. O.L.C. 114, 116 (1993) ("*ACUS*"); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188 (1981) (discussing the background of the ratification of the Clause).

The President surely "hold[s] an[] Office of Profit or Trust," and the Peace Prize, including its monetary award, is a "present" or "Emolument . . . of any kind whatever." U.S. Const. art I, § 9, cl. 8. The critical question, therefore, concerns the status of the institution that makes the award. Based on the consistent historical practice of the political branches for more than a century with respect to receipt of the Peace Prize by high federal officials, as well as our Office's precedents interpreting the Emoluments Clause in other contexts, we conclude that the President in accepting the Prize would not be accepting anything from a "foreign State" within the Clause's meaning. Accordingly, we do not believe that the President's acceptance of the Peace Prize without congressional consent would violate the Emoluments Clause.

## A.

None of our Office's precedents concerning the Emoluments Clause specifically considers the status of the Nobel Committee (or the Nobel Foundation), but there is substantial and consistent historical practice of the political branches that is directly relevant. The President would be far from the first government official holding an "Office of Profit or Trust" to receive the Nobel Peace Prize. Rather, since 1906, there have been at least six federal officers who have accepted the Prize while serving in their elected or appointed offices. The Peace Prize has been received by two other sitting Presidents—Theodore Roosevelt and Woodrow Wilson—by a sitting Vice President, Secretary of State, and Senator, and by a retired General of the Army,[2] with the most recent of these acceptances having occurred in 1973. Throughout this history, we have found no indication that either the Executive or the Legislative Branch thought congressional approval was necessary.

The first instance of the Nobel Committee awarding the Peace Prize to a sitting officer occurred only five years after the Committee began awarding the Prize. In 1906, President Theodore Roosevelt received the Peace Prize.[3] On December 10 of that year, United States Minister to Norway Herbert H.D. Pierce accepted the "diploma, medal, and order upon the Nobel trustees [of the Nobel Foundation] for the amount of the prize" on Roosevelt's behalf. *See "Emperor Dead" and Other Historic American Diplomatic Dispatches* 336-37 (dispatch from Pierce to Secretary of State Elihu Root) (Peter D. Eicher ed., 1997) ("Pierce Dispatch"). Not only did Roosevelt accept the Peace Prize while President, he also chose as President to use the award money (roughly $37,000) to establish a foundation for the promotion of "industrial peace." *See* Oscar S. Straus, *Under Four Administrations: from Cleveland to Taft* 239-40 (1922) (noting that Roosevelt transferred the draft of the monetary award to Chief Justice Fuller in January of 1907 to initiate efforts to establish the Foundation).

---

[2] *See* Memorandum to File from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Award of Honorary British Knighthood to Retiring Military Officer* (Aug. 27, 1996) (retired military officers continue to "hold[] [an] Office of Profit or Trust" under the United States and hence remain subject to the Emoluments Clause); *see also* 53 Comp. Gen. 753 (1974) (same).

[3] *See* List of Nobel Peace Prize Laureates, *available at* http://nobelprize.org/nobel_prizes/peace/laureates (last visited Nov. 19, 2009).

We have found no indication that the President or Congress believed that receipt of the Prize, including its award money, required legislative approval. Although Congress passed legislation to establish Roosevelt's foundation, *see* Act of Mar. 2, 1907, ch. 2558, 34 Stat. 1241 (1907), it did so some months *after* he accepted the Peace Prize, and we think it clear that neither the President nor Congress thought this law necessary to satisfy the Emoluments Clause.[4] The bill that established the trust said nothing about consent even though Congress assuredly knew how to express such legislative approval for Emoluments Clause purposes. For instance, the same Congress that established the foundation at Roosevelt's request also "authorized [Professor Simon Newcomb, a retired Naval Officer] to accept the decoration of the order 'Pour le Mérite, für Wissenschaftern und Kunste,' conferred upon him by the German Emperor," Act of Mar. 30, 1906, ch. 1353, 34 Stat. 1713, and granted "[p]ermission . . . to [a Navy Rear-Admiral] . . . to accept the China war medal, with Pekin clasp, tendered to him by the King of Great Britain, and the Order of the Red Eagle, with swords, tendered to him by the Emperor of Germany," S.J. Res. 98, 59th Cong., 34 Stat. 2825 (1907).[5]

Perhaps most importantly, the statute that established the foundation to administer the prize money that Roosevelt had accepted does not address at all Roosevelt's receipt of the gold medal and diploma. Yet the medal and the diploma have always constituted elements of the Peace Prize, *see* Pierce Dispatch at 337 (noting receipt of Nobel medal); *see also* Nobel Lecture of President Roosevelt (May 5, 1910), *available at* http://nobelprize.org/nobel_prizes/peace/laureates/1906/roosevelt-lecture.html (last visited Nov. 23, 2009) ("The gold medal which formed part of the prize I shall always keep, and I shall hand it on to my children as a precious heirloom."), and they constitute a "present" or "Emolument . . . of any kind whatever" within the meaning of the Emoluments Clause. Thus, if the law establishing the trust to be funded by the award money had been intended to provide congressional consent for President Roosevelt's receipt of the Prize, it would presumably have encompassed these elements of the Prize as well.

---

[4] Consistent with this understanding of the congressional action, the bill establishing the foundation was modeled after documents creating trusts, *see* Straus, *supra*, at 239, and not statutes conferring legislative consent to officers' receipt of gifts from foreign states. Further, the statute's legislative history contains no indication that the bill was intended to ratify Roosevelt's acceptance of a gift from a foreign power; nor does it indicate that his acceptance of the Prize without congressional consent was inappropriate. *See* S. Rep. No. 59-7283 (1907); *see also* 41 Cong. Rec. 4113 (1907) ("There can be no possible objection [to the bill]. It establishes trustees, who are to receive from the President the Nobel prize for the foundation of a society for the promotion of industrial peace." (statement of Sen. Lodge)). Ultimately, the Foundation never expended any funds, and in July of 1917, Congress dissolved the trust. *See* H.J. Res. 313, 65th Cong., 40 Stat. 899 (1918) ("Joint Resolution Providing for the disposition of moneys represented in the Alfred Bernard Nobel peace prize, awarded in nineteen hundred and six"). Roosevelt then distributed the Nobel Prize money, along with the interest it had accrued, to various charities in the United States and Europe. *See* Straus, *supra*, at 241.

[5] *See also*, *e.g.*, J. Res. 39, 54th Cong., 29 Stat. 759 (1896) ("authoriz[ing]" President Harrison "to accept certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States"); J. Res. 4, 42d Cong., 17 Stat. 643 (1871) ("[C]onsent of Congress is hereby given to . . . [the] secretary of the Smithsonian Institution, to accept the title and regalia of a commander of the Royal Norwegian Order of St. Olaf, conferred upon him for his distinguished scientific service and character by the King of Sweden and Norway"); J. Res. 39, 38th Cong., 13 Stat. 604 (1865) (Navy Captain "authorized to accept the sword of honor recently presented to him by the government of Great Britain"); J. Res. 14, 33d Cong., 10 Stat. 830 (1854) ("authoriz[ing] . . . accept[ance of ] a gold medal recently presented . . . by His Majesty the King of Sweden").

The example more than a decade later of President Wilson also clearly reflects an understanding by the political branches that receipt of the Peace Prize does not implicate the Emoluments Clause. When, in December of 1920, President Wilson received the Peace Prize, he, unlike President Roosevelt, did not seek to donate the Prize proceeds to a charitable cause or enlist Congress's aid in accomplishing such a charitable purpose. Instead, he simply accepted the Prize and deposited the award money in a personal account in a Swedish bank, apparently hoping for a favorable movement in the Kroner/dollar exchange rate. *See* 67 *The Papers of Woodrow Wilson* 51-52 (Arthur S. Link ed., 1992) (diary of Charles Lee Swem). President Wilson does not appear to have sought congressional approval for his acceptance, nor does it appear that Congress thought its consent was required.

These Presidents are not, as indicated above, the only federal officers who have received the Peace Prize. Senator Elihu Root in 1913, Vice President Charles Dawes in 1926, retired General of the Army George Marshall in 1953, and Secretary of State Henry Kissinger in 1973 each received the Nobel Peace Prize. *See* List of Nobel Peace Prize Laureates, *supra*. As was the case with Presidents Roosevelt and Wilson, none of these recipients, as far as we are aware, received congressional consent prior to accepting the Prize or congressional ratification of such receipt at any time thereafter.

This longstanding treatment of the Nobel Peace Prize is particularly significant to our analysis because several of the Prizes were awarded when the Nobel Committee—then known as the Nobel Committee of the Norwegian Storting—lacked some of the structural barriers to governmental control that are present today, such as rules generally barring government ministers and legislators from serving on the Committee. If anything, then, these prior cases arguably would cause more reason for concern than would be present today, and yet the historical record reveals no indication that either the Congress or the Executive believed receipt of the Prize implicated the Emoluments Clause at all. The absence of such evidence is particularly noteworthy since the Clause was recognized as a bar to gifts by foreign states without congressional consent throughout this same period of time, such that the Attorney General and this Office advised that various gifts from foreign states could not be accepted, *see, e.g.*, *Gifts from Foreign Prince*, 24 Op. Att'y Gen. 116, 118 (1902), and Congress passed legislation specifically manifesting its consent to some gifts bestowed by foreign states on individuals covered by the Clause. *See supra* n.5. To be sure, this long, unbroken practice of high federal officials accepting the Nobel Peace Prize without congressional consent cannot dictate the outcome of our constitutional analysis. But we do think such practice strongly supports the conclusion that the President's receipt of the Nobel Peace Prize would not conflict with the Emoluments Clause, as it may fairly be said to reflect an established understanding of what constitutes a gift from a "foreign State" that would trigger application of the Clause's prohibition. *Cf. American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (analyzing President's foreign affairs power under the Constitution in light of "longstanding practice" in Executive Branch and congressional silence); *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (noting that a "'systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as a gloss on'" the Constitution); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring) ("Deeply embedded traditional ways of conducting government cannot supplant the

Constitution or legislation, but they give meaning to the words of a text or supply them."); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 315, 401 (1819) (where "the great principles of liberty are not concerned . . . [a doubtful question,] if not put at rest by the practice of the government, ought to receive a considerable impression from that practice").

**B.**

The precedents of our Office reinforce the constitutional conclusion that the historical practice recounted above strongly suggests. Indeed, our Office's numerous opinions on the Emoluments Clause have never adverted to the receipt of the Peace Prize by government officials and certainly have never suggested that the numerous acceptances of the Prize were contrary to the Clause. That is not surprising. Under these same opinions, it is clear that, due to the unique organization of the Nobel Committee (including its reliance on the privately endowed Nobel Foundation), Nobel Peace Prize recipients do not receive presents or emoluments from a "foreign State" for purposes of the Emoluments Clause.

The precedents of the Office do establish that the Emoluments Clause reaches not only "foreign State[s]" as such but also their instrumentalities. *ACUS*, 17 Op. O.L.C. at 122; *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 18 (1994) ("*Public Univ.*"). Quite clearly, the Nobel Committee is not itself a foreign state in any traditional sense. The issue, therefore, is whether the Committee has the kind of ties to a foreign government that would make it, and by extension the Nobel Foundation in financing the Prize, an instrumentality of a foreign state under our precedents. Our past opinions make clear that an entity need not engage specifically in "political, military, or diplomatic functions" to be deemed an instrumentality of a foreign state.[6] *See Public Univ.*, 18 Op. O.L.C. at 19; *see also ACUS*, 17 Op. O.L.C. at 122 ("[T]he language of the Emoluments Clause does not warrant any distinction between the various capacities in which a foreign State may act."). Thus, for example, we have determined that entities such as corporations owned or controlled by a foreign government and foreign public universities may fall within the prohibition of the Clause. *ACUS*, 17 Op. O.L.C. at 121-22.

To determine whether a particular case involves receipt of a present or emolument from a foreign state, however, our Office has closely examined the particular facts at hand. Specifically, we have sought to determine from those facts whether the entity in question is sufficiently independent of the foreign government to which it is arguably tied—specifically with respect to the conferral of the emolument or present at issue, e.g., hiring an employee or bestowing an award, *Public Univ.*, 18 Op. O.L.C. at 20—that its actions cannot be deemed to be those of that

---

[6] Accordingly, we have explained that corporations owned or controlled by a foreign government are presumptively foreign states under the Emoluments Clause, even though the Act of State doctrine suggests that "when foreign governments act in their commercial capacities, they do not exercise powers peculiar to sovereigns," and thus are not entitled to the immunity from suit that might be available. *ACUS*, 17 Op. O.L.C. at 120 ("[N]othing in the text of the Emoluments Clause limits its application solely to foreign governments acting *as sovereigns*.").

foreign state. In short, our opinions reflect a consistent focus on whether an entity's decision to confer a particular present or emolument is subject to governmental control or influence.[7]

The factors we have considered include whether a government is the substantial source of funding for the entity, *e.g.*, *Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 90 (1987) ("*International Historians*"); whether a government, as opposed to a private intermediary, makes the ultimate decision regarding the gift or emolument, *e.g.*, Memorandum for John G. Gaine, General Counsel, Commodity Futures Trading Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Expense Reimbursement in Connection with Trip to Indonesia* (Aug. 11, 1980) ("*Indonesia Op.*"); and whether a government has an active role in the management of the entity, such as through having government officials serve on an entity's board of directors, *e.g.*, *Public Univ.*, 18 Op. O.L.C. at 15. No one of these factors has proven dispositive in our prior consideration of Emoluments Clause issues. Rather, we have looked to them in combination to assess the status of the entity for purposes of the Clause, keeping in mind at all times the underlying purpose that the Clause is intended to serve. *See*, *e.g.*, Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* (May 23, 1986) ("given [foreign public university's] functional and operational separation and independence from the government of Australia and state political instrumentalities . . . . [t]he answer to the Emoluments Clause question . . . must depend [on] whether the consultancy would raise the kind of concern (viz., the potential for 'corruption and foreign influence') that motivated the Framers in enacting the constitutional prohibition").

Consistent with this analysis, we have concluded in the past that Emoluments Clause concerns are raised where the "ultimate control" over the decision at issue—e.g., an employment decision or a decision to bestow an award—resides with the foreign government. For instance, an employee of the Nuclear Regulatory Commission ("NRC") sought authorization to work for a consulting firm that was retained by the Mexican government. *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982). Because we concluded that the "ultimate control, including selection of personnel, remains with the Mexican government," *id.* ("the retention of the NRC employee by the consulting firm appears to be the principal reason for selection of the consulting firm by the Mexican government"), we determined that the Emoluments Clause barred the arrangement. Similarly, we concluded that an invitation to join a commission of international historians that was established and funded entirely by the Austrian government constituted an invitation from the Austrian government itself. *International Historians*, 11 Op. O.L.C. at 90.

By contrast, although we have previously opined that foreign public universities are presumptively instrumentalities of a foreign state for the purposes the Emoluments Clause, we determined that two NASA scientists on leave without pay could be employed by the University

---

[7] Where a foreign state indisputably and directly confers a present or emolument, such considerations of autonomy and control may be relevant, but not decisive. *See ACUS*, 17 Op. O.L.C. at 119. Here, however, the critical issue is whether the Nobel Committee, and by extension the Nobel Foundation, is an instrumentality of a foreign government for purposes of awarding the privately endowed Peace Prize.

of Victoria in British Columbia, Canada, without triggering that constitutional restraint. *Public Univ.*, 18 Op. O.L.C. at 13. We came to this conclusion because the evidence demonstrated that the University acted independently of the Canadian (or the British Columbian) government when making faculty employment decisions. *Id.* at 15 ("[T]he University of Victoria should not be considered a foreign state."). To be sure, as we acknowledged, the University was under the formal control of the British Columbia government. *Id.* at 20 (noting that the government had "ultimate" control of the University); *see also id.* at 15 (noting that the faculty was "constituted" by the University's Board of Governors, the majority of whom were appointed by the provincial government). Nevertheless, it was critical to our analysis that the specific conduct at issue—the University's selection of faculty—was not made by the University "under statutory compulsion" or pursuant to the "dictates of the government." *Id.* at 20-21 (quoting *McKinney v. University of Guelph*, [1990] 3 S.C.R. 229, 269 (Can.) (plurality op.)).

Similar considerations of autonomy informed our view that a federal officer could serve as a consultant to Harvard University on a project funded by the government of Indonesia. *See* Indonesia Op. at 5. Although the consulting services were to be rendered for the benefit of Indonesia and the individual consultant's expenses were to be reimbursed by Harvard from funds paid by Indonesia, we identified no violation of the Emoluments Clause. We reached this conclusion in significant part because, under the consulting arrangement, Harvard had the sole discretion over the consultants it chose, and Indonesia had no veto power over those choices. *Id.* ("Since . . . the foreign government neither controls nor even influences the selection and payment of consultants, the Emoluments Clause is not implicated.").

In light of these precedents, we believe that it is significant that the Nobel Committee's selection of the Peace Prize recipient is independent of the dictate or influence of the Norwegian government. As far as we are aware, the Norwegian government has no authority to compel the Committee to choose the Prize recipient; nor does it have any veto authority with respect to the selection by the Committee members, who, in any event, are not appointed by a single official to whom they are accountable, but are instead elected by the multimember Storting. *See* Nobel Foundation Statutes § 1. To be sure, Norwegian government officials may submit nominations to the Committee, but that opportunity is shared by any "[m]embers of national assemblies and governments of states," along with "University rectors" and "professors of social sciences, history, philosophy, law and theology." Nobel Peace Prize Regulations § 3. Indeed, the formal process of nomination and selection of a Prize recipient is not guided by the government, but by the private, Sweden-based Nobel Foundation and the Nobel Committee.[8] For example, pursuant to the Foundation's rules, no prize-awarding body, including the Peace Prize Committee, may reveal the details of its deliberations "until at least 50 years have elapsed after the date on which the decision in question was made." Nobel Foundation Statutes § 10. We have found no

---

[8] The Storting appears to have the limited authority only to approve "[i]nstructions concerning the election of members of the Nobel Committee" itself. *See* Nobel Foundation Regulations § 9. Any other amendments to the Committee's rules of operation, including its award selection guidelines, are decided upon by the Committee itself, after views are solicited from the Nobel Foundation. *Id.* ("Proposals for amendments to other provisions of these regulations may be put forward by members of the Norwegian Nobel Committee or by members of the Board of Directors of the Nobel Foundation. Before the Norwegian Nobel Committee makes a decision concerning the proposal, it shall be submitted to the Board of Directors of the Nobel Foundation for an opinion.").

indication that the Norwegian government or its officials, if requesting such information, would be exempt from this restraint on disclosure. Other aspects of the selection process, including guidelines on nominations and supporting materials, are either provided in the private Foundation's statutes or delegated by the Foundation—not by the Norwegian government— to the prize-awarding bodies, including the Peace Prize Committee. *E.g.*, *id.* § 7 ("To be considered eligible for an award, it is necessary to be nominated in writing by a person competent to make such a nomination."). These formal limits on the capacity of the Norwegian government to influence, let alone control, the Committee's decision, are consistent with the Committee's own repeated assertions of its independence. *See* Tønnesson*, supra.*

The Government of Norway's financial connection to the Nobel Committee is even more attenuated. It appears that the members of the Nobel Committee are compensated for their services by the privately funded Nobel Foundation, *see* E-mail to Barron, and the precise amount of the remuneration is set by the Nobel Committee, not the Norwegian government. *See* Nobel Foundation Statutes § 6. The Peace Prize itself, including its cash award and other elements, is funded by the Nobel Foundation, which alone is responsible for ensuring that all of the Nobel prize-awarding bodies can accomplish their purposes and which is itself financed by private investments and not government funding. *Id.* § 14 ("The Board [of the Foundation] shall administer the property of the Foundation for the purposes of maintaining good long-term prize-awarding capacity and safeguarding the value of the Foundation's assets in real terms."); *see also* The Nobel Foundation's Income Statement (2008), *available at* http://nobelprize.org/ nobelfoundation/incomes.html (last visited Dec. 7, 2009); Lemmel, *supra* (describing Nobel Foundation's investment strategies to ensure financial base of Nobel Prizes).

Thus, in our view, the only potentially relevant tie to the Norwegian government is that, in accordance with Alfred Nobel's will, the Storting elects the Nobel Committee's five members. Further, we are aware that, notwithstanding the rules generally barring sitting members of the Storting from the Nobel Committee, two members of the Storting served on the Committee for several months before leaving their parliamentary seats. However, in light of the strong basis for the Committee's autonomy, both as to the decision it makes and the finances upon which it draws, we do not view the Storting's appointment authority, or a minority of the Committee members' short-term overlap with parliamentary service, as having dispositive significance.

Nor has our Office done so in the past in analogous cases. In determining that an award to a Navy scientist from the Alexander von Humboldt Foundation was from the German government for the purposes of the Emoluments Clause, for example, we noted that the "awards are made by a 'Special Committee,' on which the Federal Ministries for Foreign Affairs and Research and Technology are represented." *See* Letter for Walter T. Skallerup, Jr., General Counsel, Department of the Navy, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel at 2 (Mar. 17, 1983). But we did not indicate that the presence of the government ministers on the award committee was the decisive factor in our analysis. Instead, we also noted that the Foundation was reestablished (because it had once been dissolved) by the Federal Republic of Germany, specifically by its Ministry of Foreign Affairs. In addition, we noted that the Foundation that administered the award was financed mainly through annual payments from the West German government. *See id.* By contrast, the Nobel Committee is financed by the private Nobel Foundation, and although the Norwegian government may have

formally established the Committee (as the "Nobel Committee of the Norwegian Storting"), it did so pursuant to a private individual's will, which assigned the Storting the limited role of electing the Committee's members, who would be charged with exercising their independent judgments.

Likewise, we concluded that the University of British Columbia in hiring faculty was not acting as a foreign state for the purposes of the Emoluments Clause—notwithstanding the provincial government's power to appoint a majority of the members of the University's board of governors. *Public Univ.*, 18 Op. O.L.C. at 14, 22 (citing *Harrison v. University of British Columbia*, [1990] 3 S.C.R. 451, 459 (Can.) (plurality op.)). We also determined that the Prince Mahidol Foundation was not an instrumentality of the Government of Thailand for the purposes of the Emoluments Clause, although several officials of the Thai government and the Royal Princess of Thailand sat on the Foundation's board. Memorandum to File from Daniel L. Koffsky, *Re: Application of the Emoluments Clause to a U.S. Government Employee Who Performs Services for the Prince Mahidol Foundation* (Nov. 19, 2002) ("Mahidol Op.").[9] In each case, we found countervailing indications of autonomy to be more significant. As noted above, we concluded that the University of British Columbia's faculty decisions, including contract negotiations and collective bargaining, were not subject to governmental compulsion. *Public Univ.*, 18 Op. O.L.C. at 20-21 (noting University's "'legal autonomy'"). And despite the presence of the Thai government and royalty, we determined that the decision-making process of the Prince Mahidol Foundation's Board evidenced "independent judgment." Mahidol Op. at 4 (also noting that "most of the funds for the Foundation do not come from the [Thai] government"). These same considerations concerning the exercise of independent judgment and financial autonomy are at least as present here.

In sum, determining whether an entity is an instrumentality of a foreign government is necessarily a fact-bound inquiry, *see Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982) ("Each situation must . . . be judged on its facts."), and the weight of the evidence in light of this Office's consistent precedents—and as reinforced by the substantial historical practice—demonstrates that the awarding of the privately financed Peace Prize through the Nobel Committee does not constitute the conferral of a present or emolument by a "foreign State" for the purposes of the Emoluments Clause.

---

[9] Similarly, the Supreme Court has indicated that a government's appointment authority is not given dispositive weight in determining whether a nominally private entity is, in fact, "what the Constitution regards as the Government." *See Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (holding that Amtrak was a state actor subject to the First Amendment). That the federal government appointed a majority of Amtrak's directors was not considered to be of controlling importance. As the *Lebron* Court observed, the Consolidated Rail Corporation ("Conrail") was held "not to be a federal instrumentality, despite the President's power to appoint, directly or indirectly, 8 of its 15 directors." *Id.* at 399; *see also Regional Rail Reorganization Act Cases*, 419 U.S. 102, 152 (1974) ("Conrail is not a federal instrumentality by reason of the federal representation on its board of directors.").

### III.

Our reasoning regarding the Emoluments Clause is equally applicable to the Foreign Gifts and Decorations Act. The Act provides express consent for officials to accept "gifts and decorations" from "foreign government[s]" under certain limited circumstances not present here. *See* 5 U.S.C. § 7342(b) (2006) ("An employee may not . . . accept a gift or decoration, other than in accordance with the provisions of" the Act); *see also id.* § 7342(a)(1)(E) (providing that the President is subject to the Act). Section 7342(a)(2) defines the term "foreign government" as follows:

> "foreign government" means –
> (A) any unit of foreign governmental authority, including any foreign national, State, local, and municipal government;
> (B) any international or multinational organization whose membership is composed of any unit of foreign government described in subparagraph (A); and
> (C) any agent or representative of any such unit or such organization, while acting as such.

While we do not necessarily assume that Congress intended the meaning of "foreign government" to be coextensive with the constitutional term "foreign State," we have recognized that the Act's reference to "any unit of foreign governmental authority" is likely narrower in scope than the Emoluments Clause. *See ACUS*, 17 Op. O.L.C. at 121 (recognizing that corporations owned or controlled by foreign States are arguably not "units of foreign governmental authority," although they are presumptively subject to the Emoluments Clause); *cf.* S. Rep. No. 95-194, at 29 (1977) (definition of "foreign government" intended to reach "foreign governmental subdivision(s)" and "quasi-government organizations"). For the reasons discussed in detail above, the Nobel Committee in choosing the recipients of the Peace Prize, like the Nobel Foundation in financing the Prize, operates as a private non-governmental organization and not as a "unit" of a foreign government. Moreover, given the Foundation's private nature and the facts that the Committee acts independently of any government and is not required to include any government officials on it, *see The Norwegian Nobel Committee, available at* http://nobelprize.org/prize_awarders/peace/committee.html (last visited Nov. 23, 2009) ("Although this is not a requirement, all committee members have been Norwegian nationals."), we conclude that neither is an "international or multinational organization" because neither is "composed of any unit of foreign government," let alone composed of units of more than one foreign government. 5 U.S.C. § 7342(a)(2)(B); *see also* Memorandum to the General Counsel, The Smithsonian Institution, from Daniel L. Koffsky, Acting Assistant Attorney General, *Re: Emoluments Clause and World Bank* (May 24, 2001), *available at* www.usdoj.gov/olc/opinions.htm (concluding that international organizations of which the United States is a member are not generally subject to the Emoluments Clause and observing that the Act's coverage of international organizations was likely "motivated by policy concerns as opposed to constitutional ones"). Nor is the Committee as a whole, or, by extension, the Nobel Foundation in financing the Prize, an "agent or representative" of any unit of a foreign government or any international organization for purposes of the Act. Although two members of the Committee continued to serve in the Storting before leaving their parliamentary seats,

we do not believe this limited tie between the Government of Norway and the Committee, affecting a minority of the Committee's members, transformed the Nobel Committee into an agent or representative of the Norwegian government. *Id.* § 7342(a)(2)(C). The countervailing indications of autonomy described above support that conclusion. Consequently, the Foreign Gifts and Decorations Act poses no bar to the President's receipt of the Peace Prize.

## IV.

For the reasons given above, we conclude that neither the Emoluments Clause nor the Foreign Gifts and Decorations Act prohibits the President from receiving the Nobel Peace Prize without congressional consent.

Please let us know if we may be of further assistance.

/s/

DAVID J. BARRON
Acting Assistant Attorney General